IN

# THE SUPREME COURT

OF

# PENNSYLVANIA.

EASTERN DISTRICT—PHILADELPHIA, 1888.

## APPEAL OF T. MINSHALL PRATT.

FROM THE DECREE OF THE COURT OF COMMON PLEAS OF
DELAWARE COUNTY, IN EQUITY.

Argued February 7, 1887—Decided January 3, 1888.

1. In a proceeding to enjoin the use of a trade-mark, if the defendant's device is an imitation of that of the plaintiff, and calculated to deceive and mislead the public, that the defendant had no intention so to deceive and mislead is immaterial.

2. Though the two devices constituting the trade-marks, when placed side by side, present points of dissimilarity, and the distinctive name of each party appear upon the one he uses, yet if the distinguishing features of the plaintiff's trade-mark have been appropriated in that of the defendant, the latter will be restrained by injunction.

3. The grandfather, succeeded by the father, of the plaintiffs, adopted and used a trade-mark in a certain manufacture, the products of which became widely known in the markets by a distinguishing device in said trade-mark. After the death of the father, his sons, the plaintiffs, without evidence of administration and distribution of the father's estate, continued the same manufacture and the use of the same trade-mark. Subsequently they separated, and each engaged independently in the same manufacture, by agreement severally using the same trade-mark, but specialized by their proper names imprinted thereunder: *Held*, that the plaintiffs had the exclusive right to such use as against a stranger who had never acquired the right to use it in any way.

Before MERCUR, C. J., GORDON, PAXSON, TRUNKEY, STER-
RETT, GREEN and CLARK, JJ.

No. 128 January Term 1886, Sup. Ct.; court below, No. 3 June Term 1881, C. P. in equity.

On May 2, 1881, Albert Darlington, Jesse Darlington and Jared Darlington, trading as J. & J. Darlington, and Mary F. Darlington, filed a bill in equity against T. Minshall Pratt, to enjoin and restrain the latter from the use of a certain butter print as a trade-mark.

From 1810 or 1812, Jesse Darlington, the grandfather of the plaintiffs, owned a farm in Middletown township, on which he conducted a butter dairy, selling the products in the Philadelphia market. The butter was in pound and half pound masses, stamped with a device, the striking feature of which was a cornucopia in the centre, the lower end of which was curved to the left. Jared Darlington, Sen., the father of the plaintiffs, lived with his father, Jesse, and in the latter years of the latter's life was in partnership with him, jointly using the cornucopia print. After his father's death, Jared Darlington became the owner of the homestead, adding thereto two other farms in his lifetime, and continued to make butter, sold in the markets of Philadelphia and New York, impressed with the same print, with " J. Darlington " added at the bottom, and still known as the " Darlington," the " Cornucopia," or the " Horn of Plenty" butter. Jared Darlington, at his death, in 1862, left four sons, Edward, Albert, Jesse and Jared. Edward Darlington, who had married, then occupied one of the farms adjoining the homestead. In March, 1863, Jesse and Jared took the homestead, Albert removing to another farm of the father's estate adjoining the homestead. All continued making and vending butter, using, under agreement with each other, the cornucopia print, Jesse and Jared having at the bottom "J. & J. Darlington;" Albert, the old " J. Darlington;" Edward, "E. Darlington." Edward died in 1876, and his widow, Mary F. Darlington, continued the business, using the print with "E. Darlington." The production of J. & J. Darlington increased to about 1100 pounds per week; of Albert Darlington, to about 575 pounds; of Mary F. Darlington, to about 430 pounds; and it is' now sold to customers in Philadelphia, New York, Boston, Newport, Baltimore, Washington, Pittsburgh and other places.

Statement of Facts.

T. Minshall Pratt, since 1873 occupying a farm in the same township and adjoining the farms of the Messrs. Darlington, has also been manufacturing butter, using, until of late, the print of "Cumberland Dairy 333," which was the print of his father before him. In 1879 the Messrs. Darlington discovered that Mr. Pratt was using for his pound and half pound butter, which he was selling in the market, a cornucopia print very similar to their own. They then consulted counsel, and notified Mr. Pratt to refrain from the further use of such print, which they claimed as their trade-mark. The use complained of continued until this bill was filed.

The following are cuts of the prints exhibited at the time of this contention:

  

The cause being put at issue by answer and replication, *Mr. V. G. Robinson* was appointed master and examiner, who found the facts sufficiently appearing in the opinion, and, considering Dixon Crucible Co. v. Guggenheim, 7 Phila. 408; Brown T.-M., §§ 34 to 449; Morse v. Conwell, 2 W. N. 12; Glendon Iron Co. v. Uhler, 75 Pa. 471; 2 Bl. Com. 305; Ferguson v. Davol Mills, 7 Phila. 253; White v. Schlect, 9 W. N. 77; Sheppard v. Stuart, 7 W. N. 498; Fulton v. Sellers, 4 Brews. 42; Brinkerhoff v. Brown, 6 Johns. Ch. 151; Fellows v. Fellows, 4 Cow. 682 (15 Amer. D. 428); Dugan v. Vattier, 3 Blackford 245 (25 Amer. D. 105); Waller v. Todd, 3 Dana 503 (28 Amer. D. 94); Deringer v. Plate, 29 Cal. 292; Witthaus v. Wallace, 2 W. N. 610; Wamsutta Mills v. Allen, 6 W. N. 189; Gillott v. Esterbrook, 47 Barb. 455, found as matter of law that the plaintiffs were entitled to the relief prayed for, and recommended a decree enjoining the defendant from using the cornucopia print set out in the bill, and that he be required to account to the plaintiffs for all the

profits on all the butter theretofore sold by him containing the said impression.

Exceptions being filed to the master's report, on argument thereof, the court, THOMAS J. CLAYTON, P. J., filed the following opinion and decree:

The plaintiffs are manufacturers of butter, having for their trade-mark a cornucopia, accompanied with the name of the individual maker. They do business separately, each using the same print, but they distinguish each other's butter by the individual name of the maker engraved upon the print on the margin below the cornucopia.

The master finds the facts as follows: "The plaintiffs succeeded their father, and he his father in the same business. It was carried on at the same place; in the same way, and to the same customers; the one succeeding the other and the same trade-mark being continuously used."

The trade-mark claimed is an engraved cornucopia with the word "Darlington" upon the print used to impress each lump of butter offered by them for sale.

The master also finds that by agreement among the plaintiffs this trade-mark was to be used by them individually, with the modification of the initial letters. He finds that it has been used by them and their ancestors for over seventy years, and that during all that time it has been used by no one else save the defendant; that by great care and skill in the manufacture of their butter they had secured a reputation for it that enabled them to get from ten to fifteen cents a pound over that of other butter in the market; that their trade had extended to New York and Washington and many other places remote from the home market; that some of the defendant's butter had been sold to their customers as their butter and that they had been injured thereby.

The master finds substantially that all the charges and allegations of the plaintiffs' bill are true, and that the counter charges, allegations and excuses, set up in the answer, are not sustained by the testimony. The only fact found by the master favorable to the defendant, is that he did not intend to perpetrate an actual fraud in adopting the plaintiffs' mark. This is an important point in his favor, and, if he had desisted from the use of the trade-mark when so kindly warned and so

earnestly requested to do so, the plaintiffs would have been required to pay the costs of their bill if they had insisted upon further litigation. The master, however, finds that notwithstanding the plaintiffs' protest, the defendant persisted in his right to use the trade-mark and denied the plaintiffs' exclusive ownership therein. This open declaration of war left to the plaintiffs no alternative but a vindication of their right in a court of equity with all its harassing delays and burdensome expense. It is certainly to be regretted that so much valuable time and such a large amount of money should be expended upon such a very small matter, but as the master has found the fault to be in the defendant he must bear the burden of the trial.

While there are some conflicting authorities as to what constitutes a valid trade-mark, it may be safely assumed that no branch of the law is better settled, or more generally understood. The law of trade-marks is substantially the same throughout the civilized world. In some countries it is regulated by statute, in others by the unwritten rules of the common law.

While we have no statute in Pennsylvania defining a trade-mark or providing special remedies for infringements of them, our criminal code has made it a misdemeanor punishable by fine and imprisonment to counterfeit another's trade-mark with a fraudulent intent.

A trade-mark has been very tersely defined by the French law, which has been generally adopted as correct, to be " any sign serving to distinguish the products of a manufacturer, or other objects of commerce."

The law cannot describe the different kinds of marks that may be used; it can only give the general characteristics of a genuine mark. These characteristics are :

1. Invariability; that is to say, it must be fixed, positive and certain. The master finds that this cornucopia has been used without any material variation for over seventy years.

2. It must possess individuality; such a difference from other symbols as to indicate origin and ownership. The master finds that this symbol has never been used by any other manufacturer of butter, except the defendant.

3. Universality of a right to its use. That is to say, good as a

representative of, or substitute for, the owner's signature all the world over. If there were any reliable evidence that this cornucopia had been used at any other place or in any other country as a trade-mark for butter, it would not command the protection of law.

4. Exclusiveness of right to use. Upon this essential the defence partially relies. If the same mark could be used by different persons for the same species of goods, it would lead to inextricable confusion; but persons of the same name may have a common right to the same mark in connection with articles manufactured by each: Walton v. Whann, 8 Leg. G. 82. The master finds that by an agreement among the plaintiffs each had the right to use the cornucopia, their several products to be distinguished by the initial letter of the individual name upon the margin of the print. There is nothing unlawful in such an agreement.

5. It must be applicable to merchandise only. No one will doubt but that butter is merchandise. There is no ownership in a trade-mark apart from its use or application to some vendible commodity. The symbol does not become a trade-mark until stamped upon or affixed to some salable article. All the conditions of this essential requirement are fulfilled in the present case.

6. It must be used in a lawful business.

7. It must be used in good faith. The defendant alleges that the evidence does not show good faith on the part of the plaintiffs. It is alleged that the cornucopia has been printed by them upon butter made from cream which was purchased from other farmers. I have carefully examined the testimony upon this point and can discover no evidence of fraud or bad faith in the use of this trade-mark.

8. The eighth and last essential element of a trade-mark is its unlimited duration. In this it differs from a patent, a copyright, a mere label, the sign of a hotel and the like. As a man's signature lasts till his death so the trade-mark continues until the business to which it applies ceases. The facts found by the master clearly establish for the trade-mark here claimed all the foregoing eight essential characteristics.

While the question involved may not materially affect the market value of the butter of either contestant, it must be

looked upon as an abstract question of right, which they have the power to bring into court for final settlement.

The exceptions to the master's report are therefore dismissed. Let a decree be drawn in accordance with the recommendation of the master. The costs to be paid by the defendant.

And now, November 2, 1885, this case having come up for hearing and the court having carefully considered the same, after having heard the arguments of counsel, do order, adjudge, and decree that the injunction as prayed for be granted and made perpetual, and that the defendant be perpetually enjoined and restrained from using the cornucopia figure as a print upon his, the defendant's butter. And that all the costs of said suit be paid by the defendant.

The defendant then took this appeal, assigning as errors, the rulings of said opinion and the making of said decree.

*Mr. Isaac Johnson* and *Mr. John M. Broomall*, for the appellant:

1. A trade-mark carries the idea of a man's personality, like his ordinary autograph: Brown T.-M., §§ 87, 90; Dixon Crucible Co. v. Guggenheim, 7 Phila. 408. Therefore, when Jesse Darlington died, the use of his trade-mark by his son, was a fraud upon the public, declaring that the goods were Jesse Darlington's, when they were not. And there is no evidence of any administration of Jesse Darlington's estate, or that, in the distribution thereof, the right to such use passed to the son, without which the son might not continue in it: Sebastian T.-M., 96; Singleton v. Bolton, 3 Doug. 293; Hovenden v. Lloyd, 18 Week. R. 1132; Marshall v. Pinkham, 38 Amer. R. 756; Manhattan Med. Co. v. Wood, 108 U. S. 227; Sherwood v. Andrews, 5 Amer. L. Reg., N. S. 588; Satchelberg v. Ponce, 23 Fed. R. 430; Hedgeman v. Hedgeman, 8 Daly 1; Carmichel v. Latimer, 11 R. I. 395 (23 Amer. R. 481).

2. A trade-mark must possess invariability and individuality: Brown T.-M., 143. By individuality is meant oneness, entireness; property that is peculiar to the individual. A mark used by different persons, at different places, does not have individuality. It must be indivisible, and cannot be used by separate owners in separate enterprises: Sebastian T.-M.,

88; Witthaus v. Braun, 44 Md. 303; Leather Cloth Co. v. Amer. Leather Cloth Co., 11 H. L. 523.

3. Moreover, it is in evidence, that the plaintiffs bought other cream and butter, mixed it with their own, put their print on it and sold it as their own. If they must have relief from the fraud of others, they must first free themselves from this imputation : Pidding v. How., 8 Sim. 477; Phalon v. Wright, 5 Phila. 467; Hobbs v. Francis, 19 How. Pr. 567; Fetridge v. Wells, 13 How. Pr. 385; and if the print used does not declare the product to be their own manufacture, they have no trade-mark because it lacks origin or ownership: Ferguson v. Davol Mills, 7 Phila. 253; White v. Schlect, 9 W. N. 77.

4. The question whether the defendant's print was so near a copy and counterfeit of the plaintiffs' print as to be likely to deceive, was not the subject of expert testimony. It was error to determine the fact by the opinions of witnesses: Whart. Ev., 436; Insurance Co. v. Gruver, 100 Pa. 272; Aiman v. Stout, 42 Pa. 114; Aumick v. Mitchell, 82 Pa. 211; Haycock v. Greup, 57 Pa. 438; Clark v. Fisher, 19 Amer. D. 402. Moreover, the finding of the master was not supported by the testimony (reviewed).

5. No injury of any kind was shown to have been suffered either by these plaintiffs or the public. The case made being at least doubtful, the injunction should not have been decreed until the plaintiffs had established their title at law: Brown T.-M., § 386; Colladay v. Baird, 4 Phila. 139; Partridge v. Menck, 2 Sandf. Ch. 624.

*Mr. George E. Darlington* and *Mr. A. Lewis Smith,* for the appellees :

1. When death removed the original proprietor, and afterwards his immediate successor, the very same business in connection with which this trade-mark had been used for seventy years, came to the plaintiffs without change, except that it had become more extended. The property in a trade-mark may pass, with the property in the business, from parents to children without administration: Leather Cloth Co. v. Amer. Leather Cloth Co., 11 H. L. 523; Kidd v. Johnson, 100 U. S. 617; Milling v. Robinson, 2 Fed. R. 217; Southron v. Rey-

nolds, 12 Law. T., N. S., 75; Dent v. Turpin, 9 Week. R. 548; Witthaus v. Braun, 44 Md. 303: Bank v. Gibson, 34 Beav. 566; Hine v. Hart, 10 Jur. 106; Robinson v. Finlay, L. R. 9 Ch. Div. 487: Condy v. Mitchell, 37 L. T., N. S. 268, 766; Young v. Jones, 3 Hughes 274; Hugher v. Dannehofer, 82 N. Y. 499; Emerson v. Badger, 101 Mass. 82. Singleton v. Bolton, 3 Doug. 293 and Hovenden v. Lloyd, 18 Week. R. 1132, are to be distinguished.

2. No fraud can be imputed because the successor to a business does not say, on the trade-mark, that he is the successor: Fulton v. Sellers, 4 Brewst. 42; Dixon Crucible Co v. Guggenheim, 7 Phila. 408. Actual fraud is not alleged, however, and the plaintiffs distinguished their use of the emblem by the addition of their several initials. And the occasional working up with their own of butter bought by the plaintiffs when circumstances rendered it necessary for the supply of their customers, did not warrant a charge of fraud: Dale v. Smithson, 12 Abb. Pr. 237; Eddlestone v. Vick, 18 Jur. 7.

3. The facts relating to the common use of the trade-mark by the several plaintiffs, were set out in the bill. To raise this question it was the duty of the defendant to demur in limine; it was too late upon hearing on the evidence: Daniel Ch. Pr. 287, n. 1, 293, n. 1; Dias v. Bouchaud, 10 Paige 445; Cutler v. Tait, 4 Green, C. E., 549; Smith v. Bartholomew, 42 Vt. 356; Ferguson v. Fisk, 28 Conn. 511; Welford, Eq. Pl., 90*; Persch v. Quiggle, 57 Pa. 258.

4. The master found as a fact and his finding was confirmed by the court that, without the name of T. M. Pratt, or with the name if blurred, the print on the defendant's butter was so near a copy and counterfeit of that used by the plaintiffs as to be likely to deceive buyers, and had so deceived them. That finding was sustained by the testimony. Exact similitude is not required to entitle to protection: McLean v. Flemming, 96 U. S. 245; Mack v. Ticknor, 21 Blatch. 1; Liggett v. Hynes, 20 Fed. R. 883; Ayer v. Hall, 3 Brewst. 509; Dixon Crucible Co. v. Guggenheim, 7 Phila. 408.

OPINION, MR. JUSTICE PAXSON:

This bill was filed in the court below to restrain the defendant from using plaintiffs' trade-mark. The plaintiffs are farm-

ers, residing in Delaware county, and engaged in the dairy business. They make what is now widely known in many portions of this country as the " Darlington Butter," an article of such superior quality as to command a ready sale and a high price. The plaintiffs and their immediate ancestors have been engaged in making this butter for a period of about three quarters of a century. The business was commenced by Jesse Darlington, the grandfather of the plaintiffs, about the year 1810, who continued it to about 1831, when he relinquished it in favor of his son Jared Darlington, residing on the same farm. Jared continued it until his death in 1862. Since that time it has been conducted by three of his sons, and the widow of a deceased son, the plaintiffs in this bill. During all this period the butter has been stamped with a peculiar print, claimed as a trade-mark, the distinguishing features of which are a cornucopia and the name " Darlington." During the life-time of the elder Darlingtons (Jesse and Jared) the name J. Darlington was imprinted on the margin below the lower or smaller end of the horn. Since the death of Jared, and the use of the trade-mark by an amicable understanding between his children, each of the plaintiffs has stamped his butter with the cornucopia, and his own or individual name, the name of Darlington being common to it all. So extensive has the business become that their aggregate production of butter amounts to over 2000 pounds weekly.

The defendant owns a farm in the same neighborhood and also makes butter for the market. He has been so engaged since 1873. For some years he used as a print for his butter a stamp which had on it the name of " Pratt " and the words " Cumberland Dairy, 333," which appears to be the print his father, Thomas Pratt, had used before him. Some time after the death of Jared Darlington, the defendant changed his print, using the cornucopia and stamping the butter with his name.

The court below granted the injunction prayed for in the bill, from which decree the defendant appealed and removed the record into this court for review.

If the defendant's print is an imitation of that of the plaintiffs, if it is calculated to deceive and mislead, the motive of the defendant in adopting it is not material so far as the law of the case is concerned, however much it might affect it in a

moral point of view.   The protection which equity extends in
such cases is for the benefit of the manufacturer and to secure
to him the fruits of his reputation, skill and industry.   The
protection of the public is another consideration and one that
does not usually enter into such cases.   A man may be ad-
judged a wrong-doer and yet have no intention or thought of
fraud; as where two traders take the same symbol, each in ig-
norance that the other uses it or with an honest doubt as
to who has the legal right therein: Brown on Trade Marks,
§ 449.   The question therefore is whether the defendant's label
or mark is calculated to deceive the public and to lead them to
suppose they are purchasing an article manufactured by the
complainants instead of the defendant.

The master finds as a fact that defendant's print is calculated
to mislead the public.   In this we cannot say that he committed
an error.   It is true, the two prints when placed side by side
present several points of dissimilarity, and the fact that defend-
ant's butter is stamped with his own name was pressed as a
reason why there was no danger of deception.   The defendant
denies any intention of deception, and in this he is sustained
by the master.   But the thought naturally suggests itself, why
did the defendant abandon the trade-mark or print which he
had used for years and his father before him, and adopt the
symbol which had been in use in the Darlington family for
over seventy years, unless at some time or in some way he
hoped to benefit by the wide reputation which the Darlington
butter had obtained?

The master has found, and we think correctly, that the distin-
guishing feature of the plaintiffs' trade-mark is the cornucopia.
It is a symbol, a device, which the plaintiffs have adopted to
mark their butter.   Had they used merely the name " Darling-
ton," any other person of that name could have stamped his
butter as Darlington's butter.   The mere name of a person or
of a place, cannot as a general rule be appropriated as a trade-
mark; at least not in the sense of preventing another person
having the same name or residing in the same place, from
using it.   Nor can any word which is generally used to desig-
nate the name or quality of an article be so appropriated.
This is familiar law and hardly needs the citation of authority.
It is sufficient to refer to Glendon Iron Company v. Uhler,

75 Pa. 467 ; Brown on Trade Marks, §§ 167, 177, 182, 195, 243. But when the plaintiffs adopted the cornucopia as a device or symbol to mark their butter, they acquired a property in such device or symbol, which they cannot be deprived of by any other Darlington, or any other person whatever. This device when applied to a pound of butter means " Darlington Butter," and is so understood, and in this way indicates origin and ownership. The name of the particular plaintiff stamped upon each pound in addition to the symbol, indicates which particular Darlington made that pound of butter.

The use of the defendant's name on a spurious trade-mark is no defence to a bill for an injunction to prevent a piracy : The Dixon Crucible Company v. Guggenheim, 7 Phila. 416 ; Gillott v. Esterbrook, 47 Barb. 455 ; Boardman v. Meriden Britannia Co.,      Conn. 402. It is a circumstance, and nothing more, to be considered in connection with the whole appearance of the trade-mark, to determine whether it is an imitation.

It was urged, however, that conceding this symbol to have been a valid trade-mark in the hands of Jesse Darlington, or even of Jared, that upon the death of the latter, it ceased to be the property of any one, and that its use by several members of the family of the latter, destroyed its distinctive features and left it open to the public to appropriate it.

We cannot assent to this proposition. We do not think it necessary, however, to enter upon an elaborate discussion as to the modes by which a trade-mark may be transferred, nor how far it is descendible upon the death of the person who originally appropriated it. We do not see that the exigencies of this case require it. When Jared Darlington died, his children appropriated this device or symbol to their own use. They did so before any one else appropriated or attempted to appropriate it. By an amicable arrangement between themselves each one was allowed to use the cornucopia, as a device, each pound of butter being stamped in addition with the name of its manufacturer. It was all Darlington butter. There was no fraud upon the public nor any one else in this. It was not sold as the butter of either Jesse or Jared Darlington. They were both deceased and it is fair to presume their customers knew it. The business was continued by their

descendants bearing the name of Darlington, in the same place and with the same skill. There is no pretence that the butter now made by the present members of the family is not equal in every respect to the best made by their ancestors. Under such circumstances their trade-mark cannot be interfered with by a stranger who has never acquired a right in any way to use it. There is no analogy between this case and the Howqua Tea case: Pidding v. How, 8 Simons 477; the Night Blooming Cereus case, Phalon v. Wright, 5 Phila. 467; the Balm of a Thousand Flowers case, Fetridge v. Wells, 13 How. Pr. R. 385, and other instances in which courts of equity have refused to enjoin because of the fraud practiced upon the public. It is not the province of a chancellor to aid any one in fraud and imposition. The fact that the plaintiffs at rare intervals purchased milk or cream from others to enable them to supply their customers with butter, and in yet rarer instances purchased small amounts of butter for the same purpose is not of sufficient importance to require discussion. It was not done for the purpose of imposing upon or deceiving their customers. The latter are not complaining and the defendant has no standing to do so. There was no fraud in it. If the plaintiffs were to purchase all their cream from other farmers and manufacture it into butter the defendant would have no right to pirate their trade-mark.

While the cases are not uniform upon the subject there is ample and recent authority for saying not only that a business and its accompanying trade-mark may pass from a parent to his children without administration, but that the business may be divided among the children, and each will have the right to the trade-mark to the exclusion of all the world except his co-heirs. In the Leather Cloth Company v. American Leather Cloth Company, 11 H. of L. 523, it was said by Lord Cranworth: "The right to a trade-mark may, in general, treating it as property or as an accessory of property, be sold and transferred upon a sale and transfer of the manufactory of the goods on which the mark has been used to be affixed, and may be lawfully used by the purchaser. Difficulties, however, may arise where the trade-mark consists merely of the name of the manufacturer. When he dies, those who succeed him (grandchildren or married daughters, for instance), though they may

not bear the same name, yet ordinarily continue to use the original name as a trade-mark, and they would be protected against any infringement of the exclusive right to that mark. They would be so protected, because according to the usages of trade they would be understood as meaning no more by the use of their grandfather's or father's name, than that they were carrying on the manufacture formerly carried on by him." In Kidd v. Johnson, 100 U. S. 617, it was said by Mr. Justice FIELD : " When a trade-mark is affixed to articles manufactured at a particular establishment and acquires a special reputation in connection with the place of manufacture, and that establishment is transferred either by contract or operation of law to others, the right to the use of the trade-mark may be lawfully transferred with it." To the same point are Milling Company v. Robinson, 20 Fed. R. 217 ; Southron v. Reynolds, 12 Law Times N. S. 75 ; Dent v. Turpin, 9 Weekly R. 548 ; see also Dixon Crucible Company v. Guggenheim, supra.

We have not before us any question arising between the children of Jared Darlington as to their respective rights to use this trade-mark as against each other ; on the contrary, the contention is between them and a stranger who shows no right whatever. We find no error in this record.

The decree is affirmed and the appeal dismissed at the cost of the appellant.